AO (Rev. 5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | **CRIMINAL COMPLAINT** |
| vs. | |
| IAN DACRES<br>YAZID BRYANT<br>SHAUNETTE SAWYERS | CASE NUMBER: 6:11-cr-1286-01, 02, 03 |

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about June 25, 2011, in Brevard County, in the Middle District of Florida, defendants **IAN DACRES, YAZID BRYANT** and **SHAUNETTE SAWYERS** did conspire to possess and possess with intent to distribute, 500 grams or more of cocaine and did import a controlled substance (500 grams or more of cocaine), in violation of Title 21, United States Code, Sections 846, 841(a)(1), and 952(a).

I further state that I am a Special Agent with the Department of Homeland Security, and that this Complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:  ☒ Yes  ☐ No

Signature of Complainant
Fred Soly, Special Agent
Department of Homeland Security

Sworn to before me and subscribed in my presence,

June 27, 2011                           at       Orlando, Florida

DONALD P. DIETRICH
United States Magistrate Judge
Name & Title of Judicial Officer                      Signature of Judicial Officer

STATE OF FLORIDA                                          Case No:  6:11-mj-

COUNTY OF ORANGE

## CRIMINAL COMPLAINT AFFIDAVIT

The affiant, Special Agent Fred Soly of Immigration and Customs Enforcement, being duly sworn states:

1.   I am currently employed by the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE) as a Special Agent (SA) and have been so employed since September 2009.  I have successfully completed both the Criminal Investigator Training Program and the ICE Special Agent Training Program at the Federal Law Enforcement Training Center at Glynco, Georgia.  Additionally, I hold a Bachelor of Science degree in Criminology from the University of South Florida.  From February 2010 to the date of this affidavit, I have been assigned to the Office of the Resident Agent in Charge (RAC) in Cocoa Beach, Florida.  As part of my duties and responsibilities, I investigate federal criminal violations of the United States Code, as well as administrative violations of the United States Immigration and Nationality Act.  I have received extensive training in border search authority and narcotics smuggling techniques.

2.   The facts contained in this affidavit are based on my own personal knowledge, as well as information provided to me by civilians, other law enforcement officers, Special Agents of ICE and Officers of U.S. Customs and Border Protection (CBP).  Because this affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint against Yazid BRYANT, Ian DACRES, and

1

Shaunette SAWYERS, it does not contain each and every fact known to your affiant learned during the course of the investigation.

3. On June 18, 2011, the Carnival cruise vessel "Dream" departed from Port Canaveral, Florida. On June 19, 2011, the "Dream" arrived in Nassau, Bahamas. On June 20, 2011, the "Dream" was at sea until it arrived at the U.S. Virgin Islands on June 21, 2011. On June 22, 2011, the "Dream" arrived at St. Maarten. The vessel was at sea for the remainder of the journey before reaching Port Canaveral the morning of June 25, 2011. St. Maarten is located outside the Customs territory of the United States.

4. On June 21, 2011, while conducting law enforcement database checks on arriving passengers, CBP Officer Marty Felker identified Ian DACRES, a passenger aboard the "Dream" as a person of interest due to suspicious travel with BRYANT. Law enforcement database checks further indicated that SAWYERS appeared to be traveling along with DACRES and BRYANT.

5. After the "Dream" arrived at the port, CBP Officer Mike Smith, Resident Agent in Charge (RAC) Felix Mangual, SA Joe Grey, SA Ken McClenahan, and your affiant attempted to locate checked luggage belonging to BRYANT, DACRES, and SAWYERS. CBP Officer Smith, RAC Mangual, SA Grey, SA McClenahan and your affiant were able to locate two pieces of checked luggage, one with a tag attached to it in the name of Yazid BRYANT, and the other with a tag attached to it in the name of Ian DACRES. The luggage was retrieved and taken off the ship to the Customs Inspection area. Both BRYANT and DACRES were assigned to cabin 1288. The luggage had

2

been placed previously outside of cabin 1288 so that it could be checked in and retrieved from baggage claim after the vessel arrived at the port.

6.	During a search of BRYANT's luggage in the Customs Inspection area, SA McClenahan and SA Grey did not locate any contraband. However, RAC Mangual did discover a white powdery substance believed to be cocaine that was hidden in the lining of the piece of luggage associated with DACRES. A field test was conducted by SA Ken McClenahan on the white powdery substance and produced positive results for the presence of cocaine.

7.	BRYANT's and DACRES' luggage was retained in the baggage claim section of the Customs Inspection area by RAC Mangual, SA McClenahan, CBP Officer Mike Smith, and deputies from the Brevard County Sheriff's Office (BCSO) who were participating under the direction of ICE, until it was placed onto the carousel.

8.	At approximately 6:50 a.m., SAWYERS proceeded to the CBP primary inspections area. SAWYERS was escorted from the primary inspection area to the secondary inspection area. While in the secondary inspection area, Officer Felker asked SAWYERS if the luggage that she had in her possession was hers. SAWYERS stated that it was, and that she acquired the luggage while visiting St. Maarten. SAWYERS said she paid $28.00 for the luggage at a store where she also purchased an article of clothing. SAWYERS also stated that she went on the cruise by herself and that she did not know anyone else on the cruise ship.

9.	During a search of SAWYER's luggage, Officer Felker saw that there was a smaller piece of luggage inside the luggage that SAWYERS said that she acquired in St. Maarten. This smaller piece of luggage was removed from the larger one. ICE SA

3

Joe Grey assisted in the search and discovered a white powdery substance, believed to be cocaine, hidden in the lining of the larger piece of luggage that SAWYERS claimed she had acquired in St. Maarten. Officer Felker conducted a field test on the white powdery substance which had positive results for the presence of cocaine. At this point, SA Joe Grey and your affiant brought SAWYERS into a room in the secondary inspection area for an interview.

10. SA Joe Grey read and explained SAWYERS her *Miranda* rights from a pre-printed ICE statement of rights form. SAWYERS stated that she understood her rights, agreed to waive her rights, and spoke to your affiant and SA Grey.

11. During the interview, SAWYERS stated she had been in contact with someone named "Joker" who had asked her to travel to Orlando, Florida for a "business meeting." On June 17, 2011, SAWYERS said she arrived at the Orlando International Airport from Jamaica. SAWYERS said that she met with "Joker" and that he told her that she would depart on June 18, 2011 from Port Canaveral as a passenger aboard the Carnival "Dream."

12. SAWYERS said that "Joker" also told her that when the vessel arrived at St. Maarten, she was to meet with a female who would give her a piece of luggage to bring back to the United States. SAWYERS explained that "Joker" told her that the luggage she was supposed to pick up was "Joker's" brother's luggage. SAWYERS stated that she knew that "Joker's" brother was involved in trafficking drugs from the Caribbean to the United Kingdom.

13. SAWYERS claimed that she asked "Joker" what was going to be in the luggage. According to SAWYERS, "Joker" told her there was going to be money hidden

4

in the luggage. SAWYERS stated that she initially believed him because she knows that it is unlawful to bring large amounts of money into the United States, but was unsure because of what she knew about "Joker's" brother and his involvement with drugs. SAWYERS told agents that she was amenable to pick up the luggage, because if it was found and only contained money, she thought that she would not get in as much trouble as if it were drugs. SAWYERS claimed she told "Joker" that she was concerned about getting caught, but stated that "Joker" reassured her that it would go undetected. "Joker" told SAWYERS that this type of luggage had gone undetected many times before. SAWYERS told agents that she knew that the luggage "Joker" was referring to was constructed in Trinidad and that it was used to conceal contraband.

14. SAWYERS said that when she arrived back in the United States, she was supposed to give the luggage to a male who would pick her up at Port Canaveral. As payment, SAWYERS stated that she would receive $180,000 in Jamaican currency. SAWYERS equated this to be approximately two years of her salary in Jamaica.

15. SAWYERS stated that on June 17, 2011, she stayed with an individual she knew as "D. White" at the Sleep Inn located in Orlando, Florida. SAWYERS said that on June 18, 2011, she, along with DACRES and BRYANT, all traveled together from the hotel in Orlando, Florida to Port Canaveral in a vehicle driven by "D. White." SAWYERS admitted to agents that she previously lied about not knowing anyone else on the ship. SAWYERS said she did not know the names of DACRES and BRYANT, and had met them for the first time on their ride from hotel to the cruise ship. SAWYERS claimed that after the "Dream" departed from Port Canaveral, she socialized with DACRES and BRYANT both on and off the ship, but in a limited capacity.

SAWYERS said that she did not discuss her reason for being on the Carnival "Dream" with either DACRES or BRYANT.

16.   SAWYERS admitted to meeting a female in St. Maarten and acquiring a piece of luggage from her. She admitted that she had previously lied to Officer Felker about how she acquired the luggage. SAWYERS stated that when she brought the luggage back to her cabin, she looked inside and saw that it was empty. During a subsequent interview that same day, SAWYERS admitted that she suspected that the luggage contained either money or "drugs" and that it was concealed in the luggage's lining. She went on to say that she was going to cut the lining to find out what it contained, but that she did not have a knife. When asked why she would take the risk of bringing this luggage into the United States if there was a possibility that it might contain drugs, SAWYERS stated that she needed the money, took the risk, and decided that she would smuggle the contents of the luggage into the United States.

17.   SAWYERS stated that she was supposed to meet "D. White" outside of the cruise terminal when the "Dream" arrived back at Port Canaveral. She also stated that she was going to give "D. White" her luggage. SAWYERS said that "D. White" would then take her to the Orlando International Airport because she was flying back to Jamaica the same day.

18.   As SAWYERS was being interviewed, her luggage was disassembled by ICE agents, CBP officers, and BCSO deputies who were participating under the direction of ICE. Approximately 1,314 grams of cocaine was found to be hidden in the lining of the luggage.

19. At approximately 8:40 a.m., BRYANT and DACRES proceeded through the CBP primary inspection area. DACRES had two pieces of luggage in his possession. BRYANT had two pieces of luggage in his possession, one inside the other as determined by the agents upon inspection. ICE agents were notified that BRYANT and DACRES would be arriving in the baggage claim area shortly, at which point, their detained luggage was placed onto the luggage carousel. Both pieces of luggage remained under constant view of SA McClenahan and BCSO deputies until BRYANT and DACRES came to the carousel and retrieved their respective luggage.

20. BRYANT and DACRES were then brought into the secondary inspection area where Officer Felker individually asked BRYANT if the two pieces of luggage that he had in his hands were in fact his. BRYANT stated that they were. During the Customs inspection, a third piece of luggage was found inside BRYANT's unchecked luggage. BRYANT was detained until ICE SA Joe Grey and BCSO Deputy Chris Williams could interview him. SA Grey read and explained BRYANT his *Miranda* rights from a pre-printed ICE statement of rights form. BRYANT stated that he understood his rights, agreed to waive his rights, and spoke with law enforcement.

21. BRYANT initially stated that he was on the Carnival "Dream" for vacation and denied any knowledge of illegal or unlawful activities. However, BRYANT later stated that he was not on the Carnival "Dream" for a vacation, but instead traveled for the purpose of picking up a package from St. Maarten.

22. BRYANT said that one of his friends who lived in Philadelphia put him in contact with someone known as "Kid." According to BRYANT, "Kid" asked him to go as a passenger on a cruise that was to scheduled to depart Port Canaveral on June 18,

2011. BRYANT explained that he was told by "Kid" that when the vessel arrived at St. Maarten, he was supposed to meet with a female who would give him a package. BRYANT said that he was told to bring the package back into the United States. BRYANT said that when he arrived back in the United States from the cruise, he should call "Kid" for further instructions. As payment, BRYANT said that he would receive between $5,000 and $10,000.

23.   BRYANT further explained that on June 18, 2011, he traveled in a vehicle with DACRES and SAWYERS from a hotel in Orlando, Florida to Port Canaveral. BRYANT stated that he did not know DACRES prior to meeting him on June 17, 2011, when they shared a hotel room. BRYANT said he did not know SAWYERS until they met on June 18, 2011. BRYANT said that, unbeknownst to him, he and DACRES would share cabin 1288. BRYANT said he and SAWYERS socialized in a limited capacity during the cruise. They socialized both on and off the ship. BRYANT said his contact with DACRES was more frequent because they shared a cabin.

24.   When the Carnival "Dream" arrived in St. Maarten, BRYANT admitted that he, along with DACRES and SAWYERS, met with the female he was supposed to meet with in St. Maarten and he acquired two pieces of luggage from her.

25.   BRYANT stated that after he and DACRES returned to their cabin aboard the Carnival "Dream," they opened the luggage and saw that it was empty. BRYANT stated that until this time, he did not discuss the purpose of his cruise with either SAWYERS or DACRES. However, BRYANT admitted that when he saw that the luggage was empty, he and DACRES discussed what the contents could have been.

BRYANT told the agents that he suspected that there were either "pills" or "powder" concealed in the lining of the luggage.

26. BRYANT said that he tried to get in contact with "Kid" once the "Dream" arrived at the port so that he could find out what he was supposed to do with the luggage and who he was supposed to meet. BRYANT claimed to not know the end destination of the luggage. BRYANT also told agents that he checked his personal piece of luggage the night before, and carried the other two pieces off because the female in St. Maarten told him to safeguard the luggage that she gave him.

27. As BRYANT was being interviewed, his luggage was disassembled by ICE agents, CBP officers, and BCSO deputies who were participating under the direction of ICE. Both pieces of luggage that BRYANT brought down to the baggage claim area contained a white powdery substance believed to be cocaine which was hidden in the lining of the luggage. A field test was conducted by CBP Officer Felker on the white powdery substance found in both pieces of luggage, which indicated positive results for the presence of cocaine. Approximately 1,991 grams of cocaine were found in one piece of luggage, and approximately 1,115 grams in the other piece of luggage.

28. In the secondary inspection area, Officer Felker asked DACRES if the three pieces of luggage that he had in his possession were in fact his. DACRES stated that they were. DACRES was detained until ICE SA Joe Grey and BCSO Deputy Chris Williams could interview him. SA Grey read and explained DACRES his *Miranda* rights from a pre-printed ICE statement of rights form. DACRES stated that he understood his rights, agreed to waive his rights, and spoke with law enforcement.

29. During DACRES' interview, he stated that he first met with an individual located in the United Kingdom who asked him to fly to the United States. He was told by this same individual that, when he arrived in the United States, he would travel to Port Canaveral and board the Carnival "Dream" as a passenger. The "Dream" was scheduled to depart on June 18, 2011. DACRES explained that he was told that when the vessel arrived at St. Maarten, he was supposed to meet with a female in St. Maarten who would give him one piece of luggage. DACRES said that he was told to bring the luggage back into the United States. DACRES said he subsequently found out that he was going to be picking up two pieces of luggage in St. Maarten. DACRES said that he was told to leave one of the pieces of luggage in Orlando, Florida and that he would take the other piece of luggage back with him to the United Kingdom.

30. DACRES initially told the agents that he did know what was going to be in the luggage. DACRES subsequently said the luggage was supposed to contain marijuana, which he would split with his associate in the United Kingdom. Finally, DACRES admitted that is previous statements were lies. DACRES said that before he departed the United Kingdom for the United States, he knew that the luggage would not contain marijuana, but would instead contain a "Class A drug" which he believed would be either cocaine or heroin. As payment for transporting narcotics, DACRES stated that he would receive 5,000 British pounds.

31. DACRES further explained that on June 17, 2011, he stayed in a hotel room in Orlando. DACRES said that at some point that evening, BRYANT came to the room that DACRES was staying in and told him that he was supposed to stay there until the next day. DACRES said that he had not previously met BRYANT. DACRES also

claimed that he did not meet SAWYERS until the following day when he, BRYANT, and SAWYERS rode in a vehicle driven by a black male from the hotel in Orlando to the "Dream" in Port Canaveral. DACRES said he was unaware that he and BRYANT would share a cabin. DACRES said he and SAWYERS socialized, in a limited capacity, during the cruise both on and off the ship. DACRES said his contact with BRYANT was more frequent because they shared a cabin.

32. When the Carnival "Dream" arrived in St. Maarten, DACRES stated that he, along with BRYANT and SAWYERS all met with a female to pick up their respective pieces of luggage. DACRES acquired two pieces of luggage from her. DACRES stated that after he and BRYANT returned to their cabin aboard the Carnival "Dream" and opened the luggage, they saw that it was empty. DACRES said that until this time, he did not discuss his purpose of the cruise with either SAWYERS or BRYANT. However, DACRES said that when he saw that the luggage was empty, he and BRYANT discussed what the contents could be and DACRES came to the conclusion that it was not marijuana. DACRES said he believed hidden in the luggage would be either cocaine or heroin.

33. As DACRES was being interviewed, his luggage was disassembled by ICE agents, CBP officers, and BCSO deputies who were participating under the direction of ICE. The first piece of luggage that was originally detained by ICE agents was found to contain approximately 1,080 grams of cocaine. One of the remaining two of the pieces of luggage that DACRES brought down to the baggage claim area also contained a white powdery substance believed to be cocaine. The cocaine was hidden in the lining of the luggage. A field test of the white powdery substance was conducted

by CBP Officer Felker and indicated positive results for the presence of cocaine. Approximately 1,980 grams of cocaine were found in this piece of luggage.

34.  Based upon the above mentioned facts, there is probable cause to believe that Yazid BRYANT, Ian DACRES, and Shaunette SAWYERS imported into the Customs territory of the United States from a place outside the United States, 500 grams or more of a mixture or substance containing a detectable amount of cocaine in violation of Title 21, United States Code, Sections 952(a) and 960(b)(2)(B)(ii), conspired to possess with intent to distribute 500 or grams or more of a mixture or substance containing an detectable amount of cocaine, in violation of Title 21, United States Code, Section 846, and did knowingly or intentionally or possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of cocaine, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(ii).

This concludes my affidavit.

_____
Fred J. Soly
Special Agent
United States Immigration and Customs Enforcement

Sworn to and subscribed
before me this 27th day
of June, 2011

_____
The Honorable Donald P. Dietrich
UNITED STATES MAGISTRATE JUDGE